**ILLINOIS TOOL WORKS INC., Plaintiff,**

v.

**GRIP–PAK, INC., Defendant.**

**No. 89 C 5274.**

United States District Court, N.D. Illinois, E.D.

Dec. 4, 1989.

---

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Illinois Tool Works Inc. ("ITW") filed suit in this court on June 30, 1989, claiming that Grip–Pak, Inc. has infringed on two of its patents, U.S. Patent Nos. 3,733,100 (hereafter the "100 Patent"; one representation of it appears as Exhibit A to this opinion), and 4,219,117 (hereafter the "117 Patent"; a drawing of it appears as Exhibit B). Each patent describes a plastic device for carrying beverage containers. The sole licensee of these patents is Owens–Illinois, Inc. Grip–Pak manufactures and sells its own carrier, shown in Exhibit C. ITW has moved for a preliminary injunction against Grip–Pak under 35 U.S.C. § 283 (1982), which gives the federal courts the power to enjoin activities which violate any of the rights secured by patent. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338(a) (1982); Grip–Pak agrees with ITW that venue is proper in this court.

The court invited memoranda of law from attorneys for each of the parties prior to hearing evidence and argument on ITW's motion on October 30–November 6 and November 9, 1989. The court is now fully advised in this matter, having considered all of the evidence and arguments presented. From them the court has concluded that it must deny ITW's motion.

The parties agree that for ITW to obtain a preliminary injunction, it has to establish a right to it "in light of four factors: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest." The court is not to treat any one factor as dispositive; rather, the court "must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988) (footnotes omitted).

The court believes that ITW does not stand a good chance of prevailing on the merits of its complaint. The parties raised three major issues relating to the merits of ITW's complaint during the hearing: the validity of ITW's patents, Grip–Pak's infringement on those patents, and equitable estoppel. The court believes that ITW will prevail on two of these issues, the first and the third. It stumbles on the second, in such a way that undercuts ITW's entire case for an injunction.

A patent is presumed valid. See 35 U.S.C. § 282. The statutory presumption of validity puts the burden on Grip–Pak to demonstrate by clear and convincing evidence that ITW's patents are invalid. See *Atlas Powder Co. v. E.I. DuPont de Nemours*, 750 F.2d 1569, 1573 (Fed.Cir.1984). Grip–Pak's primary argument as to why ITW's patents are invalid is that each does not comply with 35 U.S.C. § 112, which requires such disclosure in the patent "to enable any person skilled in the art to which it pertains ... to make and use the same...." Grip–Pak submits that since neither patent discloses the chemical formula for the plastic one should use in making the patented carriers, neither patent enables a person skilled in the art to reproduce the patent.

The court believes that Grip–Pak will not demonstrate by clear and convincing evidence that the chemical formula of the plastic was crucial to enable one skilled in

the art to make either patented carrier. None of the patents for plastic carriers introduced into evidence—some developed by Grip–Pak's founder, Ernest Cunningham—give the chemical makeup of the plastic used in the carrier in any greater detail than the 100 and 117 Patents. This would indicate to the court that the U.S. Patent and Trademark Office ("PTO") believed that it was issuing patents for specific designs of carriers, not their components. ITW thus would likely prevail on the issue of the validity of its patents.

ITW would also prevail on the issue of equitable estoppel. As it had on the issue of the validity of ITW's patents, Grip–Pak bears the burden of proof in establishing the elements of equitable estoppel; unlike its burden on the issue of validity, Grip–Pak's burden in asserting equitable estoppel is met by a preponderance of the evidence. The lighter burden makes Grip–Pak's case for equitable estoppel much easier than that for invalidity, but not easy enough. To prove equitable estoppel, Grip–Pak must show: (1) ITW unreasonably and inexcusably delayed in filing suit; (2) this delay caused Grip–Pak prejudice; (3) ITW's affirmative conduct induced Grip–Pak to believe that it had abandoned its claims; and (4) Grip–Pak relied on this conduct to its detriment. See *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed. Cir.1987).

The court believes that Grip–Pak can prove that ITW knew of Grip–Pak's allegedly infringing activity as far back as March 1983. While this knowledge may give Grip–Pak the benefit of presumptions on the issues of the reasonableness of ITW's delay and harm from that delay, see *Jamesbury Corp. v. Litton Indus. Products, Inc.*, 839 F.2d 1544, 1555 (Fed.Cir. 1988) (Nies, concurring), regardless of this presumption this court believes it is likely that ITW had a good excuse for delay. Grip–Pak's activities were not commercially significant until 1988. The company faced problems in raising sufficient capital and designing an acceptable plastic carrier of its own, and thus from 1983 to 1988 it was unclear to ITW whether it would be economically prudent to take Grip–Pak to court. Patent lawyers do not work for free; as has been evident to the court throughout this case, both sides are expending great sums in advocating their positions. Patent owners are not expected to incur such large costs to silence commercially insignificant infringers. See *Mead Digital Systems, Inc. v. A.B. Dick Co.*, 521 F.Supp. 164, 183 (S.D.Ohio 1981), aff'd on other grounds, 723 F.2d 455 (6th Cir.1983) (three-year wait to file suit after infringer achieved profitability not unreasonable); *E.I. DuPont de Nemours v. Polaroid Graphics*, 706 F.Supp. 1135, 1145 (D.Del. 1989). Grip–Pak probably did not achieve significant commercial success until mid–1988; ITW's delay in filing suit to mid–1989 probably was not unreasonable. Thus, even if Grip–Pak were to prevail on the other elements of estoppel—ITW's affirmative conduct evincing abandonment of its claims and detrimental reliance—Grip–Pak probably would not carry the issue in its entirety.

That ITW would prevail on the issues of validity and equitable estoppel does not mean, however, that it will prevail altogether on the merits. This is because the court believes that, as a matter of law, Grip–Pak's carrier does not infringe on either of ITW's patents. On this issue, ITW bears the burden of proof by a preponderance of the evidence. See *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985). In deciding whether an accused device infringes on a patent, the court must proceed in two steps. The court must first construe the claims of the patent. The court then must compare the claims to the accused device. See *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986). This process ensures that the court determines infringement on the basis of the claims of the patent, and not on the basis of the patent holder's commercial embodiment of the claimed invention. See *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed.Cir.1985).

The court will look first at the 100 Patent. That patent has two claims; ITW argues for purposes of this motion that Grip–Pak's carrier infringes only on the

first. The first claim reads, in pertinent part:

A predetermined length of strip stock for forming a plurality of container carriers for different selected numbers of pairs of containers, said strip stock comprising ... second web means longitudinally extending and interconnecting ... adjacently positioned pairs of bands, each end of said second web means providing a longitudinally projecting tab extending toward a line transversely of said strip stock and passing through each of ... first web means, said tabs extending substantially longitudinally outwardly of the contiguous edges of [encircling] bands whereby a longitudinally deflectable tab is provided at each end of a strip produced by a selective severance of said first web means and a pair of opposed tabs are provided intermediate each pair of adjacently positioned pair of bands which is connected to a second pair of longitudinally adjacent bands when connected by said first web means.

The parties ask the court to construe the words "longitudinally projecting tab." The court will interpret these words first according to their "ordinary and accustomed" meanings, unless it appears that the inventor used them differently. See *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984), quoting *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 137 F.2d 3, 6 (7th Cir.1943). If the court cannot ascertain the meaning of these words from their plain usage, the court will look to other aids, including the language of other claims in the patent, the prior art carriers, the history of the patent's prosecution, and the entire specification of the patent. See *SRI Intern.*, 775 F.2d at 1118.

Webster's Third New International Dictionary (1967) defines "tab" as, among other things, "a short flap, loop, or other device projecting from an object to facilitate its identification or grasping" or "appendage: extension." The word "projecting" is defined as "protrusive." The word "longitudinal" is defined as "of or relating to the lengthwise dimension: axial." Another definition in Webster's is "extending

in length: placed or running lengthwise—opposed to *transverse*" (italics in original).

Other language in the first claim of the 100 Patent suggests that the inventor used the common meanings of the words "longitudinally projecting tab." The patent's use of "longitudinally" fits easily with the phrase which succeeds it, "extending toward a line transversely of said strip stock and passing through each of ... first web means...." Placement of the tabs in the "longitudinal" position is the only way one could obtain a tab at the end of the strip upon severance of the first web means, and opposing tabs in the positions the patent describes. The meaning of "projecting," protrusive, matches the phrase "extending substantially longitudinally outwardly of the contiguous edges of each of [encircling] bands...." "Projecting" can contrast with "extending," which means "stretching out: ranging." While "extending" can mean protrusive, it need not always be. The inventor's use of "projecting"—it appears only once in the claim—instead of his oft-used term "extending" to describe the 100 Patent's tab suggests that the inventor did not use them synonymously.

The prosecution history of the 100 Patent confirms this court's reading of "longitudinally projecting tab." When the inventor of the 100 Patent filed his application in May 1971, this phrase did not appear in it. The inventor described the tab merely as "longitudinally extending ... at each end of said second web means." After the PTO rejected the application as obvious, the inventor amended his application. Now the tab became the result of a longitudinal extension of the second web means "to an extent sufficient to produce a reverse bend between the sides of [the elongating] bands and said second web means...." The PTO did not understand what "reverse bend" meant, and rejected the amendment partly for this reason. The inventor amended his application again, replacing the "reverse bend" language and stating that each end of the second web means included "a longitudinally extending tab, ... each of said tabs extending substantially longitudinally outwardly of the contiguous edges of [the elongating] bands." A final amendment

added the phrase "longitudinally projecting tab."

The phrase "longitudinally projecting tab" in the 100 Patent thus means an appendage protruding from the second web means, along the axis of the second web means. It is apparent from looking at Exhibit C that the Grip–Pak device does not have this feature of the 100 Patent. The curved dashed lines running substantially transversely on both ends of the longitudinal web in Exhibit C (designated "A" in the drawing) are perforations in the plastic sheet which comprises the Grip–Pak carrier. These perforations produce what could be called an appendage to the longitudinal web of the Grip–Pak carrier, and they are located along the longitudinal axis of that carrier. The Grip–Pak carrier thus has longitudinal tabs. These tabs do not project or protrude, however. They are absorbed within the longitudinal web of the carrier.

The court thus believes that ITW will not be able to demonstrate that the Grip–Pak carrier infringes literally on the 100 Patent. There is, however, a second way that ITW could assert infringement: by the doctrine of equivalents. "[A] patentee may involve this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to achieve the same result.'" *Graver Mfg. Co. v. Linde Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), quoting *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929). In order to decide whether an accused device is equivalent to the patented device, the court must look at the patented device as a whole. Each of the patent's limitations "must be viewed in the context of the entire claim." Further, "to be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed." *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532–33 (Fed.Cir.1987).

According to the specification of the 100 Patent, the longitudinally projecting tab has two functions. It first provides a deflectable surface which eases the carrying of containers. This feature was not particularly new—a deflectable tab having the same purpose appears in the prior art which the inventor of the 100 Patent submitted to the PTO in applying for his patent—but it was useful. The second feature of the tab—one mentioned three times in the specification of the 100 Patent and touted in the inventor's remarks accompanying the penultimate amendment to the 100 Patent application—is "the formation of a tab or price tag at each end of the carrier...." The specification acknowledges that this is the by-product of severing the finger-holes of the 100 Patent, but purports that this is a beneficial result.

From the evidence presented at the hearing, the court believes that ITW can show that the tabs on Grip–Pak's carrier substantially perform one of the functions of the 100 Patent's tabs (providing a deflectable surface) in substantially the same way (by weakening part of the longitudinal web of the carrier) to achieve the same result (easing the carrying of the device when loaded). ITW will not be able to show, however, that the Grip–Pak tab performs the other function of the tab: providing a surface for affixing price or other information. The Grip–Pak carrier provides no such surface. While the commercial container industry may not have clamored for the price-tag feature of the 100 Patent, it is a feature which ITW took pains to highlight. It is feature that Grip–Pak's carrier does not have.

Substitution of the Grip–Pak tab for the 100 Patent's tab would prevent the 100 Patent from performing its advertising function. Under *Perkin–Elmer,* this prevents this court from calling the tabs substantially equivalent. Were the doctrine of equivalents about changing substantial *features* of patents, the court would have to say that Grip–Pak's carrier infringes. The price-tag tab may have been an insubstantial feature of the 100 Patent, one which a person could omit and still have a marketable product. But *Perkin–Elmer* suggests

that the focus of the doctrine of equivalents is substantial *changes* to claimed functions. The 100 Patent claimed certain functions; Grip–Pak's carrier does not perform all of them. To this extent, Grip–Pak's carrier probably does not infringe on the 100 Patent under the doctrine of equivalents. See also *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–39 (Fed.Cir.1987) (absence of claimed function in accused device merits finding of no infringement under doctrine of equivalents).

The court now turns to the 117 Patent. That patent has seventeen claims; as with its claim of infringement on the 100 Patent, ITW asserts for purposes of this motion that Grip–Pak infringes only on the first claim. That claim reads in pertinent part:

> In a carrier device for multipackaging a plurality of cylindrical containers in two adjacent rows, ... said carrier device comprising two rows of integrally interconnected bands lying in the plane of ... sheet material [forming the carrier device], ... a plurality of first and second web means, each of said first web means interconnecting one transversely aligned pair of bands in said two rows, each of said second web means interconnecting one longitudinally adjacent pair of bands in each row, each of said bands comprising an outer section and an inner section extending between said second web means creating an initial aperture configuration, ... said inner sections disposed between said outer sections and between said first and second web means, *each of said inner sections being substantially V-shaped in configuration in the plane of said carrier device* and defined generally by a pair of legs extending inwardly relative to the outer section and intersecting at an apex region, each of said first web means having a total length overlapping a portion of outer margin of each pair of said legs in the longitudinal direction between said two rows defined by extremities, each extremity interconnecting a pair of opposing legs of transversely aligned inner sections on either side of the apex regions of said transversely aligned inner sections....

The parties dispute the meaning of the italicized portion of this claim. Grip–Pak contends that a "substantially V-shaped" configuration is one with substantially straight edges, coming to a substantially definite apex. ITW argues that the term admits a broader construction, one describing a structure which could have somewhat curved edges and no apex, or even resemble an arc.

According to Webster's, "V-shaped" means "having the general shape of the letter V or resembling a V in cross section." In formal printing a V's shape is distinct: it has straight edges which come to an apex. Informally, a V is not as definite as that. Even Webster's allows for things having the "general" shape of a V, and the 117 Patent allows greater flexibility still in calling for a "substantially V-shaped" configuration.

This does not mean that "substantially V-shaped" means whatever ITW says it means. ITW is somewhat persuasive in demonstrating how one can gradually change a prototypical V-shape, one with straight edges and an acute angle at the intersection of those edges, into a semi-circle. The problem with any gradual approach, however, is that it often is merely a slow way to get to an extreme. Suppose that one gradually changed another aspect of the V-shape, the interior angle. Theoretically, two lines can form an apex when they have an interior angle of 179°, but reasonable persons would call the resulting figure substantially straight instead of substantially V-shaped. It is true, as the parties repeatedly point out, that an inventor may be his or her own lexicographer. But when the inventor uses unadorned English and provides no definitions for his words, the reader of the patent may conclude that the inventor used the same lexicon which the general public uses.

Still, the term "substantially V-shaped" is unclear, and thus the court must look to other sources besides plain meanings to discover the thrust this limitation. The other language of Claim 1 states that "a pair of legs extending inwardly relative to the outer section" of the device defines the

inner section. This language does not answer the question; legs can be straight or curved, and other language in Claim 1 (omitted in the excerpt above) suggests that when the inventor wished to describe something as straight or substantially straight, he knew how to do so. Nevertheless, the legs must intersect at an "apex region." An "apex" is defined in Webster's as the "vertex of an angle, cone, or pyramid." An angle is "the figure formed by *two lines* diverging from the same point...." (Emphasis added) This suggests that at bottom the inner sections of the 117 Patent have two distinct, substantially straight legs intersecting at one point.

The specification of the 117 Patent reinforces this conclusion. The inner sections are "V-shaped ..., having a pair of leg sections intersecting at an apex." According to the specification, when one applies a lateral stretching force to the outer margins of the device, the "generally straight lines" of these legs change to "an arc." This would suggest that prior to application of the lateral force, the shape formed by the two legs is not an arc.

The prosecution history of the 117 Patent also supports the court's definition of "substantially V-shaped" configuration. This language appeared in the inventor's first patent application, which the PTO rejected on grounds that three prior inventions, U.S. Patent Nos. 4,018,331 (hereafter the "Klygis Patent"), 4,033,457 (hereafter the "Weaver Patent"), and 4,149,631 (hereafter the "Cunningham Patent") disclosed the inventor's claimed structure "except the shape which is considered obvious as a matter of choice." Later correspondence between the inventor and the PTO reveals that the "shape" which disturbed the PTO that of the disputed inner section. In responding to the PTO on December 26, 1979, the inventor of the 117 device argued that the shape of the inner section was not obvious as a matter of choice. He argued that in the Klygis Patent, an example of which appears as Exhibit D to this opinion, "the area where the intermediate band regions connect the outer bands is flat.... The claims in [the 117] application restrict a

first web means to connection points on legs which are on either side of an apex." This stresses the importance of the apex to the 117 Patent. As for the Weaver Patent, the inventor argued that it too did not have the limitation which distinguished the 117 Patent from the Klygis Patent. This was because "the inner band section defining the aperture is a portion of a circular arc." The Weaver Patent lacked a first web means overlapping "any apex identifiable as claimed by applicant." See also Exhibit E. The Cunningham Patent similarly lacked the critical, distinctive apex. See Exhibit F.

Two distinct, substantially straight legs intersecting at an apex define the 117 Patent's inner section. Viewed this way, the Grip–Pak device lacks such an inner section. Like the Weaver Patent, the Grip–Pak device has an inner section which is semi-circular and arcual. It lacks two distinct, substantially straight legs which intersect at an apex. ITW thus will not be able to show that the Grip–Pak device infringes literally on the 117 Patent. This leaves infringement via the doctrine of equivalents. Had the 117 Patent been a pioneer invention, this court would have to conclude that ITW probably could show infringement under the doctrine of equivalents. The inner sections of the Grip–Pak device perform substantially the same function (providing an aperture for insertion and retention of a container) in substantially the same way (by placement of intersecting plastic bands and webs) to achieve substantially the same result (a light-weight carrier for containers which a machine can apply to the container through a single, unidirectional force). But the inventor of the 117 Patent had to contend with the prior art—especially that of Klygis, Cunningham, and Weaver. As demonstrated above, the inventor of the 117 Patent distinguished his device by insisting on the substantially V-shaped configuration of the inner section of his creation. This estops the inventor of the 117 Patent from now claiming, via the doctrine of equivalents, that the substantially V-shaped configuration is a meaningless limitation. See

*Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed.Cir.1983) (describing "prosecution history estoppel").

This court concludes that ITW probably will not be able to prevail on the issue of infringement, and thus its chances of prevailing on the merits as a whole are slim. The court now must consider whether ITW will suffer irreparable harm if Grip–Pak continues to make carriers. Irreparable harm is presumed when the patent holder clearly shows that his or her patent is valid and that the defendant has infringed on it. See *Smith Intern., Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.1983). ITW has not shown that Grip–Pak's device infringes on its patents, and so ITW does not deserve a presumption of irreparable harm. ITW argued in the hearing that it will suffer two harms from Grip–Pak's activities. First, the 100 Patent expires in May 1990. ITW contends that were the court to allow Grip–Pak to market its device now, it would encourage others to join Grip–Pak in employing the patented features of the 100 Patent free of license prior to May 1990. This argument presumes, however, that Grip–Pak is impermissibly using the 100 Patent. The court believes that Grip–Pak is not infringing on the 100 Patent, as a matter of law. Since Grip–Pak is not infringing on the 100 Patent, this court's tolerance of Grip–Pak's activities will not give others the incentive to infringe. Other competitors could choose to copy Grip–Pak's device, of course, and market their own non-infringing device.

ITW's second claimed harm is that it will lose market share and business opportunities to Grip–Pak in a way that Grip–Pak will not be able to recompense. When a patent holder can clearly show that his or her patent is valid and that the defendant has infringed on the patent, the law is quite solicitous of the patent holder's right to control the market for his or her patented product. Money damages are felt to compensate insufficiently and imprecisely for incursions on this market while litigation proceeds, as the patent holder becomes a compulsory licensor of his or her patent. See *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985). Where

infringement is less certain, the law is more tolerant of the imprecision of monetary compensation. The courts in that instance will use damages to protect the patent holder's rights from infringement occurring during the pendency of litigation—particularly if there is a means of estimating the value of the market. In *T.J. Smith & Nephew, Ltd. v. Consol. Med. Equipment,* 821 F.2d 646 (Fed.Cir.1987), the court affirmed the district court's denial of a preliminary injunction when the district court determined that the patent holder did not have a reasonable likelihood of prevailing on the merits of its case. The court also found that the patent holder had not demonstrated irreparable harm, as the patent holder had licensed its patent to two other companies and had unduly delayed in seeking an injunction. The Federal Circuit noted that these acts were "incompatible" with the patent holder's usual right to exclude others from the market. *Id.* at 648.

This court believes that in instances where the patent holder has not demonstrated a reasonable likelihood of success on the merits, but has licensed its patent to another, monetary damages can sufficiently compensate the patent holder for infringement occurring during the course of the litigation. Such is the case here. It is undisputed that ITW has licensed its patents to another company. ITW thus does not have the exclusive market for plastic carriers, and the court can place a value on the market for those carriers by looking to the licenses themselves. There was no showing at the hearing that were the court to assess damages against Grip–Pak for infringement during the course of this matter that Grip–Pak could not pay. The court thus believes that ITW has not shown irreparable harm as a result of Grip–Pak's activities.

The hardships in this case tilt in Grip–Pak's favor. Were this court to deny ITW its injunction, but ultimately find infringement, Grip–Pak could respond in damages. In the meantime, ITW probably would continue as a going concern, albeit a less profitable one. By contrast, were the court to enjoin Grip–Pak's activities—activities

which are the core of its business—Grip–Pak might not survive the intervening period. Were ITW's case for infringement strong, the court would give little weight to this possibility. The law does not distinguish between "Fortune 500" and mom-and-pop infringers. But infringement is not clear in this case—in fact, it is remote. The effect of an injunction upon the accused thus cannot be ignored.

The public interest is evenly split in this case. Public policy favors protection of patent rights. See *Smith Intern.*, 718 F.2d at 1581. Such protection, however, should not come at the expense of legitimate competition. In all likelihood, Grip–Pak is competing legitimately with ITW in the beverage carrier market. To inhibit such competition upon a remote showing of infringement is not in the public interest, as it will be the public who will pay for such unnecessary protection.

As the Federal Circuit instructed in *Hybritech*, 849 F.2d at 1451, no one of the four equitable considerations is dispositive in considering a patent holder's request for a preliminary injunction. Nevertheless, where the issues are legal, as opposed to factual, the court acts with greater certainty when it estimates the likely outcome of the litigation. New cases certainly could reshape the foundations of this court's legal conclusions, but this possibility is more remote than that of new evidence changing the court's impression of the facts. This court's conclusion as to the lack of infringement colors not only its estimate of ITW's reasonable likelihood of success on the merits. It also heightens the court's regard for Grip–Pak's ability to pay money damages for infringement during the course of this litigation, and the harm to Grip–Pak should the court order it to stop making its carrier. On balance, the court believes that it would be inequitable for an injunction to issue.

The court denies ITW's motion for a preliminary injunction.

EXHIBIT A

EXHIBIT B

EXHIBIT C

EXHIBIT D

EXHIBIT E

EXHIBIT F