**ALLIANCE RESEARCH CORPORATION,**
Plaintiff,

v.

**TELULAR CORP.; Spectrum Information Technologies, Inc., Defendants.**

No. CV 94–1065 RG.

United States District Court, C.D. California.

July 25, 1994.

---

Michael J. Emling, Chan & Jodziewicz, Los Angeles, for plaintiff.

C. Edward Simpson, Michael J. Abbott of Jones, Bell, Simpson & Abbott, Los Angeles, Marvin N. Benn, George W. Hamman, Dawn M. Cassie, Hamman & Benn, Chicago, for defendant.

*Order Denying Defendant's Motion for Preliminary Injunction.*

GADBOIS, District Judge.

## I. *Background*

Telular Corporation ("Telular") owns U.S. Patent No. 4,658,096 (" '096 Patent"), which describes an interface device that connects ordinary telephone equipment with wireless cellular networks. Telular also owns U.S. Patents 4,775,997 ('997 Patent) and 4,922,517 ('517 Patent), which describe interfaces which connect standard telephone equipment with a conventional cellular mobile radio transceivers. Both the '997 patent and the '517 patent are continuations of the '096 patent.

By allowing persons to use ordinary, standard telecommunications equipment wherever cellular service is available, these interfaces help residents of remote areas and traveling businessmen. Of course, unlike standard telephone equipment, cellular systems do not have dial tones. Instead, cellular systems require the user to enter a "send" command, indicating that the user has finished entering the phone number. Since standard telephone equipment cannot tell a cellular system to "send" a call, the interface must do so.

Determining when to send a call is complicated because phone numbers have different numbers of digits. A local call has seven digits, a long distance call ten (or eleven, if the user must first enter a "1"), while international numbers have widely varying numbers of digits. Interfaces might approach this problem in a number of different ways. The interface might analyze the first digit and determine whether a call is local or long distance, thereby determining how many digits are in the complete phone number. Alternatively, the interface could use a delay or "time-out" method, sending the number if a fixed time has elapsed since the last digit was entered. In other words, if the user hasn't done anything for the last few seconds, he must be finished.

Telular manufactures an interface covered by the patents and markets it both internationally and domestically. Telular has also granted limited licenses of the interface patents. According to William DeNicolo, Telular's Chairman of the Board, sales of Telular products have skyrocketed from $250,000 in 1989 to $17,000,000 in 1993. DeNicolo Dec. ¶ 2 (April 26, 1994). Ninety-five percent of Telular's sales are of devices covered by the patents at issue. *Id.* ¶ 3.

In December 1993, Alliance Research Corporation ("Alliance") announced that it would sell a cellular interface in January 1994. Al-

liance's interface connects lap-top computer modems to cellular systems, thereby allowing owners to send and receive data virtually anywhere. Although Telular does not itself manufacture a portable interface for computer modems, Telular believed that Alliance's interface, which uses a delay or "time-out" method, infringes Telular's patents, and sent Alliance copies of the '517 and '997 patents. DeNicolo Decl. ¶ 14 (April 26, 1994). Nevertheless, after receiving an attorney's opinion that its devices did not infringe Telular's patents, Alliance began selling the Cellular/Data Link in January 1994. Cooper Decl. ¶ 6. Shortly thereafter, Telular wrote Alliance, accusing it of infringing claim 1 of the '997 patent and claims 1 and 2 of the '517 patent. Exh. A to Motion for Prelim. Inj.; DeNicolo Decl. ¶ 15 (April 26, 1994). Alliance then sued for declaratory judgment of noninfringement; Telular counterclaimed for infringement. Telular now moves for a preliminary injunction.

## II. *Analysis*

### A. *Standard for Preliminary Injunction.*

■ To obtain a preliminary injunction in a patent case under 35 U.S.C. § 285, a plaintiff must demonstrate 1) that it has a reasonable likelihood of success on the merits; 2) that it will suffer irreparable harm absent an injunction; 3) that the balance of hardships tips in its favor; and 4) that the injunction is in the public interest. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *Hybritech, Inc. v. Abbott Lab.*, 849 F.2d 1446 (Fed.Cir.1988). None of the four factors is dispositive; the district court must weigh each and consider the form and severity of the relief requested. *Id.* Moreover, "[i]f a preliminary injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify denial." *FMC Corp.*, 3 F.3d at 427. Courts must also remember "that a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed.Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994).

### B. *Likelihood of Success on the Merits.*

#### 1. *File Wrapper Estoppel.*

■ Under doctrine of file wrapper estoppel, a patentee who amends claims during prosecution to avoid prior art cannot later contend that the patent covers what he abandoned. *Townsend Eng'g Co. v. Hitec Co.*, 829 F.2d 1086, 1090 (Fed.Cir.1987); *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1579 (Fed.Cir.1983). Alliance notes that Telular distinguished two other systems during prosecution, Chernoff Decl. ¶¶ 14–15, and argues that it abandoned Alliance's method of sending calls. However, Alliance's declarations do not show that Telular abandoned *Alliance's* method of sending signals. Given the sketchy state of the record, this Court concludes that file wrapper estoppel does not reduce Telular's chances of success at trial.

#### 2. *Patent Validity.*

■ As Telular notes, a patent is presumed valid. 35 U.S.C. § 282; *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388 (Fed.Cir.1987) (remarking that a motion for preliminary injunction must be evaluated "in the context of the presumptions and burdens that would inhere at trial on the merits."). Telular forgets, however, that "the presumption does not relieve a patentee who moves for a preliminary injunction from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity." *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed.Cir.1992). Thus, "[w]hile it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense [to validity] lacks substantial merit." *Id.* at 883.

Alliance's defense relies on Frederic J. Harris' opinion that the patents are wholly anticipated or at least obvious. Harris Decl. ¶¶ 6, 13 and 14. Telular disagrees, arguing that the continuation patents are almost certainly valid because Judge Letts found the parent patent valid. *See DNIC Brokerage v. Morrison & Dempsey Communications*, 14 U.S.P.Q.2d 1043, 1989 WL 418806 (C.D.Cal.

1989). Indeed, *Morrison & Dempsey* is evidence that the continuation patents are valid, *Hybritech*, 849 F.2d at 1452, but the shadow cast by Alliance's allegations of inequitable conduct in that case undermines *Morrison & Dempsey*'s persuasiveness.

Specifically, Alliance insinuates that Telular deliberately withheld information from Judge Letts. Andrew H. LaMothe, one of Telular's experts in *Morrison & Dempsey*, states that Telular's counsel withheld certain prior art from him when it asked him to render an opinion regarding the '096 patent and obviousness. LaMothe Decl. ¶¶ 1–3. LaMothe reviewed the additional prior art after testifying before Judge Letts, and concluded that Telular's '096 patent was obvious. LaMothe Decl. ¶¶ 13–14. Lamothe states that he told Marvin Benn, of Hamman & Benn, Telular's counsel, that the additional prior art changed his mind, but Benn did not tell Judge Letts of LaMothe's revised opinion.

Telular argues that this Court should disregard LaMothe's declaration because LaMothe is lying, emphasizing that LaMothe works for Hughes Network Systems, which allegedly plans to sell a device infringing Telular's patents.[1] This Court cannot embrace Telular's speculation and conclude that LaMothe is lying, nor can it completely disregard his declaration.

Telular next argues that Judge Letts neither relied upon nor required LaMothe's testimony to reach his decision, since Telular provided other expert testimony. This Court questions this argument. First, if LaMothe was an inconsequential witness, why did Telular bother to submit his testimony? Second, the *Morrison & Dempsey* record strongly suggests that Judge Letts did rely, in part, on LaMothe. *See* Transcript, October 21, 1988 at 16–21. On the current record, this Court cannot downplay the import of LaMothe's testimony.[2] LaMothe's declaration undercuts the weight this Court assigns to *Morrison & Dempsey*.

Telular argues that in addition to *Morrison & Dempsey*, public and industry acquiescence indicates that the patent is valid. *See Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). Indeed, both Spectrum and Motorola have paid substantial sums for licenses of the continuation patents. Similarly, Telular maintains that its invention has created an entirely new market, suggesting that it was not obvious. DeNicolo Decl. ¶ 12 (April 26, 1994). Finally, Telular's expert, O'Brien, believes that the patents are valid, notwithstanding LaMothe's about-face.

Overall, the weight of the evidence suggests that Telular's patents are valid.

### 3. *Infringement.*

▮ A patentee does not have to demonstrate that it will certainly prove infringement. *H.H. Robertson Co.*, 820 F.2d at 390. Rather, it need demonstrate only that it is *likely* to prove infringement at trial. *Id.* Alliance's expert, Daniel Chernoff, argues that Telular cannot meet even this standard. According to Chernoff, Alliance's device lacks two elements of both the '517 and '997 patents: 1) "last-digit determination;" and 2) an automatic send signal coupled with the determination of the last digit. Chernoff Dec. ¶ 7. As Chernoff notes, the '997 patent describes an interface method including a "step of ... automatically determining at least the last-dialed number of the telephone number dialed on the telephone ... device." Similarly,

---

1. Telular notes that LaMothe says he changed his opinion "[l]ater in 1988," LaMothe Decl. ¶ 15, yet Telular continued to designate him as an expert until October 1988. If LaMothe changed his mind, Telular asks, why would Telular continue to designate him as a witness? Although Telular's query is intriguing, the dates in the record are not precise, and LaMothe has not had a chance to answer this question.

2. Telular also argues that even if what LaMothe says is true—and Telular steadfastly denies that it is—Telular had no duty to inform Judge Letts that LaMothe had changed his opinion. Telular is incorrect. Telular presented LaMothe's testimony to Judge Letts, and obtained a preliminary and permanent injunction based in part on LaMothe's opinion. If Telular knew of LaMothe's change of heart, it had a duty to inform Judge Letts, so that he could reconsider the preliminary injunction and determine whether a permanent injunction was truly appropriate.

the '517 patent describes a system including "determination-means ... for automatically determining the last digit of the group of telephone digits [entered]." Alliance describes how this works in Telular's devices:

> In other words, Telular's claimed invention involves (a) a process of detecting whether the *first* digit dialed is a 0, a 1, or some other number; (b) thereafter counting down the appropriate number of digits required to make up a complete telephone number [thereby determining the *last* digit of the number], before (c) initiating a "send" signal over the radio or cellular transceiver.

Opposition at 8; Chernoff Decl. ¶¶ 7, 9.

Alliance argues that its two devices, unlike Telular's invention, use timing mechanisms and do not always determine when a complete phone number has been entered. Alliance's Version 1 determines whether a certain time period has elapsed since the user last entered a digit, while Alliance Version 2 determines whether a certain time has elapsed since the user removed the receiver from its cradle. Chernoff ¶ 10. Once the time has expired, the Alliance devices send the signal. Alliance maintains that since its devices cannot determine whether a complete telephone number has been dialed, they do not determine the "last digit" of the telephone number and do not infringe.

Telular's expert, Kevin O'Brien, disagrees. He believes that Alliance's Cellular/Data Link devices (both Version 1 and Version 2) meet every element of at least claims 1–4 of the '997 patent and at least claim 1 of the '517 patent. O'Brien Decl. ¶¶ 7–10; 12. Indeed, both continuation patent specifications discuss a delay method as one means for determining the last digit dialed: "If ... international dialing is to be accomplished ... the SEND code is generated when a three second gap occurs after a digit is dialed. In international dialing, one cannot

assume a predetermined number of digits and thus a timing operation has to be relied upon." '517 patent Column 10:30–37. Telular maintains that the patents therefore cover Alliance's products, since a means plus function claim encompasses the structure disclosed in the specification and equivalents thereof. 35 U.S.C. § 112.

Alliance replies that Telular's patents analyze the first digits entered to determine if an international call is being dialed, and use the delay method only if an international prefix is entered. This Court is not confident, however, that this distinction is significant. Based on the current record and argument, this Court believes that Telular has shown a reasonable likelihood of success on the infringement issue.

## C. *Irreparable Harm to Telular.*

Although Telular does not directly compete with Alliance,[3] it contends that it is entitled to a virtually conclusive presumption of irreparable harm because it has made a strong showing of likely success on the merits. *Nutrition 21 v. United States,* 930 F.2d 867, 871 (Fed.Cir.1991); *Hybritech,* 849 F.2d at 1456. This Court disagrees. First, although Telular has shown a reasonable likelihood of success on the merits, this Court is reluctant to call Telular's demonstration "strong." Second, even if Telular is entitled to a presumption, an "entitlement to a presumption of irreparable harm [is] not in itself and in every case ... dispositive of the irreparable harm question.... [A] presumption of irreparable harm to a patentee is, like all presumptions, rebuttable." *Illinois Tool Works, Inc. v. Grip–Pak, Inc.,* 906 F.2d 679, 681–82 (Fed.Cir.1990). Thus, even if Telular is entitled to a presumption, this Court must still determine the weight to be given that presumption. *See FMC Corp.,* 3 F.3d at 427 (noting that none of the four factors is dispositive; the district court must weigh each

---

**3.** Telular frets that consumers may adapt Alliance's device to compete directly with Telular's own products. DeNicolo Decl. ¶ 2 (July 12, 1994); Alliance Users Guide ¶ 8.

However, at oral argument, Alliance's counsel explained that using Alliance's device to mimic Telular's products would be awkward and expensive. Moreover, Telular fails to provide this

Court with any detailed *evidence* to substantiate its fears. Who is using Alliance's products in this manner? How are they doing it? Are Alliance's products perfect or imperfect substitutes for Telular's products? How difficult and expensive is it to use Alliance's products in this manner? How has it affected Telular sales? Telular does not say.

and consider the form and severity of the relief requested); *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed.Cir. 1985) ("[W]hen a patentee 'clearly shows' that his patent is valid and infringed, a court may, *after a balance of all of the competing equities*, preliminarily enjoin another from violating the rights secured by the patent.") (emphasis added).

In the instant case, Telular relies heavily on the presumption, but adds that its licensees, Motorola and Spectrum, are being harmed as well. However, Telular fails to present any declarations detailing how Alliance competes with Motorola and Spectrum; explaining which Motorola and Spectrum products serve as substitutes for Alliance's devices; or illustrating how Alliance's entry into the market has affected Motorola's and Spectrum's sales.[4] Without *evidence* of irreparable harm to Telular or its licensees, Telular's broad, conclusory statements regarding "market share" and "control of the patent" are entitled to little weight.[5]

Finally, the licenses themselves undercut Telular's claim of irreparable harm. If money damages cannot compensate Telular for infringement, why did Telular sell Spectrum the right to make the interface? In fact, the licenses themselves may ultimately indicate the value of the patent. *Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 725 F.Supp. 951, 958 (N.D.Ill.1989), *aff'd*, 906 F.2d 679 (Fed.Cir. 1990) ("[T]he court can place a value on the market for those [products] by looking to the licenses themselves."). Even if this Court gives Telular the benefit of a presumption, Telular's showing of irreparable harm is fairly weak.

### D. *Balance of Hardships.*

"The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastat-

ing." *Illinois Tool Works*, 906 F.2d at 683. In the instant case, Alliance has created good will through a marketing campaign which has already cost approximately $200,000. Cooper Decl. ¶¶ 7, 8, 11, 12; Ianetta Decl. ¶¶ 8–14. These advertising dollars have apparently been well-spent: The Cellular/Data Link has been spectacularly successful. The device won the Innovators '94 Design and Engineering Honors Program Award as one of the most innovative consumer electronics products of 1994, Cooper Decl. ¶ 7, and has been featured in business publications, newspapers, general interest publications, and trade publications. Ianetta Decl. ¶ 10. As a result, Alliance's sales increased tenfold from January to May 1994. *See* Cooper Decl. Exh. D. Cooper estimates that a preliminary injunction at this stage would cost Alliance at least $1,814,000, not including lost profits, Cooper Decl. ¶ 11, and would close the window of opportunity for these products forever. "The life cycle of this product is very short, less than two years, because new cellular technology which is not compatible with the Cellular/Data Link technology is being introduced at the present time." Cooper Decl. ¶ 12.

Telular does not dispute that Alliance has made a substantial and successful investment. Telular argues, however, that Alliance did so at its own peril, *after* receiving a letter notifying it of infringement. Alliance responds that although this is true, it obtained a legal opinion that its devices did not infringe before marketing the device. Cooper Dec. ¶ 6. Although this legal opinion may ultimately be found to be erroneous, this Court cannot say that it is clearly incorrect. Therefore, this Court concludes that Alliance did not proceeded recklessly or unreasonably, and refuses to disregard Alliance's post-notice expenditures.[6] The balance of hardships tips heavily in Alliance's favor.

---

**4.** Alliance asks this court to reject any harm to Motorola and Spectrum as too remote, arguing that this Court can only consider harm to Telular itself. This Court need not resolve this issue, however, since Telular does not present any detailed evidence documenting the harm to Motorola and Spectrum.

**5.** At oral argument, Telular suggested that litigation itself is irreparably harming Telular, as

though a preliminary injunction would end this case. Since Telular's argument would justify a preliminary injunction in virtually every patent case, this Court rejects it.

**6.** Telular cites *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986), arguing that this Court should ignore Alliance's post-notice expenditures. However, *TWM Mfg.* makes

**406**

### E. *Public Interest.*

 The public has an interest both in protecting patent rights and in ensuring that markets are competitive. *Illinois Tool Works,* 906 F.2d at 684. When evaluating the public interest, courts should focus on "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech,* 849 F.2d at 1458. In the instant case, Alliance has not demonstrated any *critical* public interest at stake. Although the public interest is probably marginally better served by granting Telular's motion, this Court concludes that the public interest is not a critical factor in this case.[7]

### III. *Conclusion*

This motion is not easily resolved. Ordinarily, this Court would have given Judge Letts' opinion considerable weight, but LaMothe's declaration, coupled with the Harris declaration, justifies another look at the validity of Telular's patent. Moreover, although Telular has demonstrated a reasonable likelihood of infringement, this Court is not convinced that this likelihood is strong.

Although the likelihood of success slightly favors Telular, the balance of hardships strongly favors Alliance: While Alliance offers specific, concrete evidence detailing its potential harm, Telular relies on a presumption, unable to articulate with particularity how either it or its licensees will be irreparably harmed absent a preliminary injunction.

In these circumstances, accepting Telular's position would be perilously close to proclaiming that patentees are routinely entitled to preliminary injunctions. Yet this Court is reminded that "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp.,* 995 F.2d at 1568. Telular has not demonstrated that such drastic measures are justified.

no such statement, and is a post-judgment case, not a preliminary injunction decision. Telular fails to cite any preliminary injunction case holding that courts must ignore post-notice expenditures, even if the defendant has obtained advice of counsel before continuing.

Therefore, Telular's motion for preliminary injunction is DENIED.

**IT IS SO ORDERED.**

7. Even Alliance concedes that if it is enjoined, Spectrum may provide a substitute for Alliance's interface; thus, the market may not completely lose a valuable product. Emling Decl. ¶ 6.