**ALTERNATIVE PIONEERING SYSTEMS, INC., a Minnesota corporation, Plaintiff,**

v.

**DIRECT INNOVATIVE PRODUCTS, INC., a Pennsylvania corporation, and California Production Group, Inc., a California corporation, and Robert Warden, Defendants.**

Civ. No. 4–92–278.

United States District Court, D. Minnesota, Fourth Division.

June 3, 1993.

Mark P. Wine, J. Randall Benham, and Laurel A. Graham, and Oppenheimer, Wolff & Donnelly, and Alan G. Carlson, J. Derek Vandenburgh, and Merchant & Gould, Minneapolis, MN, for plaintiff.

Paul R. Hannah, Hannah & Zenner, St. Paul, MN, and Alan H. Bernstein, Robert S. Silver, and Caesar, Rivise, Bernstein Cohen & Pokottilow, Ltd., Seven Penn Center, Philadelphia, PA, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiff Alternative Pioneering Systems, Inc.'s ("APS") motion for a preliminary injunction on its false advertising and patent infringement claims. Based on a review of the file, record and proceedings herein, the court denies APS's motion for an injunction on both its false advertising and patent infringement claims.

## BACKGROUND

APS sells a countertop oven under the trademark "Jet Stream Oven." One of the ways that APS markets its oven is through the use of a thirty-minute copyrighted infomercial.[1] The APS infomercial features APS's president, David Dornbush, cooking a wide variety of foods in the Jet Stream Oven. Dornbush speaks to the audience throughout the APS infomercial, extolling the virtues of the Jet Stream Oven.

Defendant Direct Innovative Products, Inc. ("DIP") markets a similar product called the Galloping Gourmet Perfection–Aire Oven ("Perfection–Aire Oven"). DIP uses an infomercial that is similar in content to APS's infomercial to entice consumers to purchase its oven. DIP's infomercial features defendant Robert Warden cooking many of the same foods that Dornbush cooks in the APS infomercial. Warden also extols the virtues of the Perfection–Aire Oven throughout the infomercial and makes many claims that are similar to those made by Dornbush.

In July 1992, APS moved the court for a preliminary injunction, arguing that DIP's infomercial infringes on its copyright in violation of 17 U.S.C. §§ 501(a) and 106(1), (2), (4) and (5) because the DIP infomercial improperly replicated its infomercial's format, content, language, graphics, food choices and general look and feel. The court denied APS's motion.[2] *See Alternative Pioneering Systems, Inc. v. Direct Innovative Products, Inc., et al.,* Cv. No. 4–92–278 at p. 19–20, 1992 WL 510190 (D.Minn. Aug. 20, 1992).

APS now moves the court for an order preliminarily enjoining DIP from continuing to make certain representations in its infomercial and from selling a certain product.

1. An infomercial is a television commercial that demonstrates how a particular product is used. Infomercials are longer than typical television commercials, with many such programs running approximately thirty-minutes in length. Infomercials also encourage viewers to purchase the advertised products while the commercial is airing by calling a toll free number.

2. The court also denied the following motions the defendants made in response to APS's motion for a preliminary injunction:
   1. Defendants California Production Group, Inc. and Robert Warden's motion to dismiss the case against them pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure because the court lacks personal jurisdiction over them;
   2. The defendants' motion to dismiss the case against them pursuant to 28 U.S.C. § 1406(a) because venue is improper in Minnesota; and
   3. The defendants' alternative motion to transfer the case to the Central District of California pursuant to 28 U.S.C. § 1404(a). *See Alternative Pioneering Systems, Inc. v. Direct Innovative Products, Inc., et al.,* Cv. No. 4–92–278 at p. 7–12 (D.Minn. Aug. 20, 1992).

The facts underlying both issues are set forth below.

### A. *False Advertising*

APS contends that certain claims that DIP makes in its infomercial[3] concerning cooking speed are false and constitute violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Minnesota Deceptive Trade Practices Act, Minn.Stat. § 325D.44, the Minnesota Unlawful Trade Practices Act, Minn.Stat. § 325D.13 and the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69. The alleged false statements are:

1. A seven-pound standing roast cooks in the Perfection–Aire Oven in one hour and forty-five minutes versus four hours in conventional oven;

2. Bread bakes in the Perfection–Aire Oven in thirty minutes versus one hour and thirty minutes in a conventional oven;

3. A breakfast consisting of bacon, sausage, soft boiled eggs, hash brown potatoes and cinnamon rolls cooks in ten minutes in the Perfection–Aire Oven;

4. A lunch consisting of vegetable and meat kabobs, french fries, onion rings, burgers and hot dogs cooks in 10 minutes in the Perfection–Aire Oven; and

5. A frozen cherry pie cooks in the Perfection–Aire Oven in forty-five minutes versus one hour and thirty minutes in a conventional oven.

APS contends that the results from independent laboratory tests performed by Results Technology ("R–Tech") confirm that those statements are false. APS thus asks the court to enjoin DIP from airing any infomercial containing one or more of those claims.

DIP argues that no injunction is warranted because APS fails to demonstrate that the claims contained in its infomercial are false. DIP maintains that the contested claims are true and that the laboratory tests results to the contrary are not reliable because the testing methodology is flawed. DIP thus requests that the court deny APS's motion for a preliminary injunction with respect to the false advertising claim.

### B. *Patent Infringement*

APS contends that when it applied for a patent on the Jet Stream Oven in 1987,[4] it disclosed the concept of using one or more rings ("expander ring") to enlarge the interior dimension of its oven. Approximately six months after it began marketing the Jet–Stream Oven, APS began selling the expander rings as an accessory and submitted claims to the U.S. Patent and Trademark Office ("patent office") to cover the rings. The patent office issued a patent on the expander ring, U.S. Patent No. 5,165,328 ("'328 Patent") on November 24, 1992.

DIP, which began selling its Perfection–Aire Oven in November 1991, after APS began selling both its Jet Stream Oven and expander ring, sells a similar accessory ("extension ring") that increases the interior dimensions of its oven. APS contends that DIP's sale of extension rings for use with the Perfection–Aire Oven infringes on at least one claim contained in the '328 patent. APS thus contends that an injunction prohibiting DIP from selling its extension ring is warranted.

DIP contends that no injunction is warranted because questions exist regarding the validity of the '328 patent and, therefore, APS cannot establish a likelihood of success on the merits of its infringement claim or demonstrate irreparable harm. DIP thus requests that the court deny APS's motion with respect to its patent infringement claim.

### DISCUSSION

■ The court considers four factors in determining whether to grant a preliminary injunction:

1. Is there a substantial probability that the plaintiff will prevail on the merits;

2. Is there a substantial threat that the plaintiff will suffer irreparable harm if relief is not granted;

---

**3.** Although the court refers to a singular infomercial, it notes that various versions of DIP's infomercial exist. For purposes of simplification, the court will not refer to specific infomercials.

**4.** APS received U.S. Patent No. 4,817,509 on its Jet Stream Oven from the U.S. Patent and Trademark Office in 1989.

3. Does the irreparable harm to the plaintiff outweigh any potential harm that granting the preliminary injunction may cause the defendants; and

4. The public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc); *see also Hybritech, Inc. v. Abbott Lab.*, 849 F.2d 1446, 1451 (Fed.Cir.1988) (court weighs same factors when considering patent infringement claim); *Pretty Punch Shoppettes v. Hauk*, 844 F.2d 782, 783 (Fed.Cir.1988) (same) (citing *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981)). None of the *Dataphase* factors by itself is determinative and the court must balance the four factors to determine whether an injunction is warranted. *Hybritech*, 849 F.2d at 1451; *Datascope Corp. v. Kontron, Inc.*, 786 F.2d 398, 401 (Fed.Cir.1986); *Dataphase*, 640 F.2d at 113. APS, the party requesting the injunction, bears the burden of proof concerning the four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

### A. False Advertising Claim

#### 1. Likelihood of Success on the Merits

■ APS alleges that DIP's infomercial violates the Lanham Act, 15 U.S.C. § 1125(a),[5] the Minnesota Deceptive Practices Act, Minn.Stat. § 325D.44,[6] the Minnesota Unlawful Trade Practices Act, Minn.Stat. § 325D.13[7] and the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69.[8] The court uses an analysis substantially similar to that applicable to federal claims under the Lanham Act to analyze claims based on the previously cited Minnesota statutes. *See e.g., Multi–Tech Sys., Inc. v. Hayes Microcomputer Prod., Inc.*, 800 F.Supp. 825, 847 (D.Minn.1992) (citations omitted); *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 849–50 (D.Minn.1989); *Scott v. Mego Int'l, Inc.*, 519 F.Supp. 1118, 1137 (D.Minn.1981). Accordingly, the court analyzes only APS's Lanham Act claim to determine whether it is likely to succeed on the merits of its false advertising claims.

■ APS must prove five factors in order to prevail on its claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[9] Those factors are:

(1) DIP made false statements of fact about its own products or APS's products in its advertisements;

(2) Those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience;

(3) Such deception is material because it is likely to influence buying decisions;

---

5. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) provides, in part, that:

   (a)(1) Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol or device, or any combination thereof, or ... false or misleading description of fact, or false or misleading representation of fact, which—

   . . . . .

   (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities
   shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

6. Minn.Stat. § 325D.44, subd. 1, provides, in part, that:

   A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, the person:

   . . . . .

   (5) represents that goods or services have ... characteristics ... [or] benefits ... that they do not have....

7. Minn.Stat. § 325D.13 provides that:

   No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality ... of such merchandise.

8. Minn.Stat. § 325F.69, subd. 1, provides, in part, that:

   The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

9. APS urges the court to apply the test utilized by the courts located in the Second Federal Judicial Circuit in its analysis of the likelihood of success factor. *See e.g., McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1548–49 (2d Cir.1991). The court declines to apply the test set forth in *McNeil* because it determines that the standard the court sets forth better addresses the concerns underlying a false advertising claim.

(4) DIP caused its falsely advertised goods to enter interstate commerce; [10]

(5) APS has been or is likely to be injured as the result of those activities either by direct diversion of sales from itself to DIP, or by injuring the goodwill its products enjoy with the buying public.

*See Multi–Tech,* 800 F.Supp. at 845 (citing *Alpo Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C.Cir.1990) (citations omitted); *Cook, Perkiss & Liehe v. Northern California Collection Serv., Inc.,* 911 F.2d 242, 244 (9th Cir.1990); *Truck Components, Inc. v. K–H Corp.,* 776 F.Supp. 405, 408 (N.D.Ill.1991) (citations omitted); *Energy Four, Inc. v. Dornier Medical Sys., Inc.,* 765 F.Supp. 724, 730 (N.D.Ga.1991) (citations omitted).

■ APS can satisfy its burden regarding the first factor by demonstrating that DIP's representations regarding the speeds in which various foods cook in the Perfection–Aire Oven are literally false or that the representations, though literally true, are likely to mislead consumers. *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 13 (7th Cir.1992) (citations omitted); *McNeil,* 938 F.2d at 1549 (citations omitted). APS does not contend that DIP's representations, although literally true, are likely to mislead consumers.[11] Rather, APS argues that the results of the R–Tech tests, as set forth in the Streu affidavit,[12] demonstrate that DIP's

**10.** It is undisputed that APS can establish the fourth factor if it can show that DIP's representations concerning cooking speed are false. Therefore, the court will not discuss that factor.

**11.** If APS were to pursue this avenue, it would have to present evidence of actual consumer confusion to demonstrate the misleading nature of the representations. *See Coca–Cola Co. v. Tropicana Prod., Inc.,* 690 F.2d 312, 317 (2d Cir.1982) (citation omitted).

**12.** The R–Tech test results corresponding to the five disputed claims are as follows:

Claim 1. A seven-pound standing roast cooks in the Perfection–Aire Oven in less than two hours to medium-well versus four hours in a conventional oven.

Result: "The roasts cooked in the Perfection–Aire were unacceptable. The internal temperature ranged from 118[] [degrees] F to 160[] [degrees] F, depending on how far into the roast the temperature was taken.... The National Livestock and Meat Board states that the internal temperature for a medium roast is 160[] [degrees] F. A rare roast is 140[] [degrees] F, which is above the low temperature recorded from the roast cooked in the Perfection–Aire oven."

Streu Aff., Exh. A. at p. 14.

Claim 2. Bread bakes in the Perfection–Aire Oven in thirty minutes versus one hour and thirty minutes in a conventional oven.

Result: "The infomercial states that frozen bread dough may be cooked in the Perfection–Aire. Two steps are shown: rising the bread dough at 150[] [degrees] for 15 minutes, and baking the dough at 350[] [degrees] for 15 minutes. It is not clear if the bread dough is thawed prior to rising....

The only loaf of bread that was acceptable in the Perfection–Aire oven was the dough that thawed at room temperature for 3¾ hours before rising and baking in the oven. However, this would not result in a time savings over the conventional oven method."

*Id.* at 4.

Claim 3. A breakfast consisting of bacon, sausage, soft boiled eggs, hash brown potatoes and cinnamon rolls cooks in ten minutes in the Perfection–Aire Oven.

Result: "Testing was done with a pre-heated oven in duplicate, and with a cold oven.... The results of the preheated oven were marginally acceptable overall. The sausage was slightly pink in the center, and the hash browns were not browned, and tasted uncooked. The results of the preheated oven were marginally acceptable overall. The sausage was slightly pink in the center, and the hash browns were not browned, and tasted uncooked. The results of test 1 in a cold oven were unacceptable. The bacon did not brown or crisp, and the sausage was still pink in the center. The hash browns were not cooked. The results of test 2 in a cold oven were unacceptable. The whites and yolks of the eggs were watery and were significantly less than soft boiled. The has browns were not browned and tasted uncooked."

*Id.* at 7.

Claim 4. A lunch consisting of vegetable and meat kabobs, french fries, onion rings, burgers and hot dogs cooks in 10 minutes in the Perfection–Aire Oven.

Result: "Testing was conducted with a preheated oven, and with a cold oven.... The results with the preheated oven were considered acceptable. The beef patties were medium rare to medium and the hot dogs reached acceptable temperatures. The french fries and onion rings were crisp. The results with the cold ovens are unacceptable. The ground beef was rare and reached internal temperatures of only 114[] [degrees] F to 130[] [degrees] F. The departure of Health and Human Services recommends an internal temperature of 140[] [degrees] F or higher, or the product is considered to be potentially hazardous."

representations regarding the speed in which various foods cook in the Perfection–Aire Oven are literally false. APS thus contends that it has satisfied its burden with respect to the first factor.

DIP contends that APS's argument is without merit. DIP argues that APS cannot use the R–Tech test results to establish that it will likely be able to prove falsity because R–Tech employed flawed testing procedures and, therefore, the test results are not reliable.

The court finds that DIP's argument is persuasive. It is not clear from the record that R–Tech employed the same cooking procedures in its tests that DIP employed in its infomercial. APS did not demonstrate that R–Tech used the same oven temperatures as DIP used in its infomercial. R–Tech did not always preheat the Perfection–Aire Oven as instructed in the Perfection–Aire Oven operating manual. There is no accurate comparison between the size of the portions of food used by R–Tech in its tests and by DIP in its infomercial. In at least one comparison, R–Tech used a product noticeably different from the one DIP used in its demonstration. In the infomercial, DIP cooks a cherry pie with a lattice-top crust. In its comparison, R–Tech only cooks cherry pies with solid-top crusts and provides no analysis of the impact, if any, of cooking a pie with a solid crust as opposed to a pie with a lattice crust. More important, DIP has submitted evidence challenging the efficacy of the R–Tech test results. The affidavit of Julie Turnbull,[13] a food consultant, and the affidavits of Robert Warden and Cathy Mitchell–Nielsen, suggest that if used properly, a person can cook the foods at issue in a Perfection–Aire Oven and achieve acceptable results within the time limits stated in the infomercial. The court thus concludes that the R–Tech test results do not support APS's claim that it likely will succeed on the merits of its false advertising claim.

APS argues that even if the representations regarding actual cooking times are not themselves false, the representations in the DIP infomercial are nevertheless literally false because the infomercial implies that the Perfection–Aire Oven need not be preheated to obtain the results in the infomercial. APS thus contends that DIP's failure to mention that the oven usually must be preheated to obtain results similar to those in the infomercial constitutes a literally false representation that is actionable under the Lanham Act.

The court determines that DIP's failure to state in the infomercial that the Perfection–Aire Oven usually must be preheated does not constitute a false representation. Looking at the infomercial as a whole, *cf. Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir.1986) ("Fundamental to any task of interpretation is the principle that text must yield to context." Recognizing this, the Supreme Court long ago inveighed against "'the tyranny of literalness.'" (citations omitted)), the court finds that the infomercial does not imply that a person can both prepare and cook a meal in the limited times stated in the infomercial.

*Id.* at 9.

Claim 5. A frozen cherry pie cooks in the Perfection–Aire Oven in forty-five minutes versus one hour and thirty minutes in a conventional oven.

Result: Three brands of 37 ounce frozen cherry pie were tested in both the Perfection–Aire and the conventional oven.... The pies cooked in the Perfection–Aire were unacceptable with the exception of the Mountain Top pie which was very marginally acceptable. The Mrs[.] (sic) pies cooked in the Perfection–Aire oven had a raw bottom crust, and thin cherry juice filling. The filling did not set up at all and was very difficult to cut into a wedge. The Sara Lee pies cooked in the Perfection–Aire oven had a raw bottom crust, but the filling appeared thick. The filling did not taste cooked and had a starch taste. The Mountain Top pie cooked in the Perfection–Aire oven had a dark top crust, but the bottom crust was not done. The filling was thin and was difficult to cut into a wedge. All pies cooked in the conventional oven were acceptable."

*Id.* at 11.

13. In a letter to the court dated April 14, 1993, APS requests that the court decline to consider the affidavit of DIP's expert because it was submitted after oral arguments. Letter of Mark Wine to the Court dated April 14, 1993. The court, however, noting the seriousness of the extraordinary relief that APS seeks, has considered the Turnbull affidavit in the interest of undertaking an informed analysis of the issues before it. Moreover, DIP's submission of the affidavit after oral arguments is in keeping with an understanding that the parties communicated to the court.

That some viewers of the DIP infomercial might believe that the Perfection–Aire Oven need not be preheated does not compel a finding of literal falsehood. Such an impression might support a claim under the Lanham Act based on consumer misperception. APS, however, has not attempted to establish such a claim. Moreover, DIP's representations regarding the speed in which food cooks may constitute nothing more than non-actionable puffing. *See e.g., Cook, Perkiss & Liehe,* 911 F.2d at 245–46 (statements that are literally beyond the realm of reason constitute puffery). Accordingly, the court finds that APS has failed to demonstrate that it is likely to establish the first Lanham Act factor and that failure to do so warrants a finding that APS is not likely to succeed on the merits of its false advertising claim.

The court notes that even if APS were to establish that DIP's representations are literally false, the court would nevertheless find that APS failed to satisfy its burden because it has not demonstrated that the alleged misrepresentations would deceive or have deceived a substantial number of consumers and that such deception would likely influence their buying decisions, the second and third factors of a Lanham Act claim. Accordingly, the court concludes that the first *Dataphase* factor, the likelihood of success on the merits, weighs in favor of denying APS's request for an injunction on its false advertising claim.

### 2. Irreparable Harm to APS

■ Generally, irreparable harm is presumed for purposes of a preliminary injunction motion on a false advertising claim once the moving party establishes a likelihood that the disputed claims are false. *See e.g., Abbott Lab.,* 971 F.2d at 16 (presumption is that "injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss") (citations omitted); *McNeil,* 938 F.2d at 1549 (proof that advertisement is false is sufficient to establish requisite harm) (citation omitted). Because the court has concluded that APS has not established that it is likely to succeed on the merits of its false advertising claim, APS does not enjoy that presumption. Besides relying on the presumption, APS submits no other tangible evidence that it will suffer irreparable harm

if the court denies its motion for a preliminary injunction. The court thus finds that APS has not satisfied its burden with respect to the second *Dataphase* factor, the irreparable harm to the movant, and concludes that the second factor weighs in favor of denying APS's request for an injunction on its false advertising claim.

### 3. Balance of Harms

Injunctive relief is not appropriate if the hardship to DIP, should the preliminary injunction be issued, outweighs the hardship to APS, should the preliminary injunction be denied. The court finds that APS will not be substantially harmed if the court denies its motion for a preliminary injunction. APS might lose some profits if the court permits DIP to continue airing the current version of its infomercial and the court later determines that the representations in the infomercial are false. That potential harm, however, is not the type of harm that warrants the issuance of a preliminary injunction, especially in light of the fact that APS has failed to demonstrate that it is likely to succeed on the merits of its false advertising claim. Moreover, balanced against that potential harm to APS is the harm DIP would likely suffer if the court were to issue a preliminary injunction. DIP would be forced to produce a new infomercial or abandon a proven marketing technique. An injunction might also cripple DIP's ability to compete with APS during the pendency of this litigation. An inability to compete might irreparably harm DIP's economic viability. Balancing the potential harms to the parties, the court finds that the potential harm to DIP should the court issue an injunction would be a greater burden than the potential harm to APS should the court deny its request for an injunction. The court thus concludes that the third *Dataphase* factor, the balance of harms, weighs in favor of denying APS's motion for an injunction on its false advertising claim.

### 4. The Public Interest

■ Consumers have a right not to be subjected to deceptive or confusing advertisements so that they can accurately assess the quality of a product and choose a product

that is in accordance with their preferences. *See W.L. Gore & Assoc., Inc. v. Totes, Inc.,* 788 F.Supp. 800, 813 (D.Del.1992) (citations omitted); *see also American Home Prod. Corp. v. Johnson & Johnson,* 654 F.Supp. 568, 590 (S.D.N.Y.1987) (finding that the public's interest in being free from deceptive advertising prevails over an advertiser's right of commercial speech). False or misleading advertising deprives the public of that information and may lead them to make purchases they might not otherwise make if they were supplied with truthful information.

■ The public also has an interest in fostering open and fair competition. *W.L. Gore,* 788 F.Supp. at 814 (citation omitted). Because APS has not demonstrated that it is likely to succeed on the merits of it false advertising claim, the court determines that this latter interest prevails at this stage of the litigation. Accordingly, the court concludes that the fourth *Dataphase* factor, the public interest, weighs in favor of denying APS's motion for a preliminary injunction on its false advertising claims.

Based on the foregoing, the court concludes that APS has not made a sufficient showing under *Dataphase* to justify the entry of a preliminary injunction on its false advertising claim.

## B. *Patent Infringement Claim*

### 1. Likelihood of Success on the Merits

■ APS contends that DIP's sale of extension rings literally infringes on its '328 patent. To establish a likelihood of success on the merits of its patent infringement claim, APS must establish that the '328 patent is (a) infringed; (b) valid; and (c) enforceable. *Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed.Cir.1991) ("[A]t the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing a likelihood of success on the merits with respect to the patent's validity, enforceability and infringement." (emphasis in the original) (citation omitted)).

#### (a) Infringement

■ The court undertakes a two-part analysis to evaluate a literal infringement claim. First, the court construes the claims portion of the patent. *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.) (citations omitted), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1118 (Fed.Cir.1985) ("A claim is construed in light of the claim language, the other claims, the prior art, the prosecution history, and the specification. . . ."). Second, the court determines whether each limitation in the properly construed claim is found literally in the alleged infringing product. *Fonar,* 821 F.2d at 631. For purposes of this preliminary injunction proceeding only, DIP does not dispute that the sale of its extension ring infringes on claim 19 of the '328 patent and that APS can establish this factor.

#### (b) Validity

■ Generally, a patent and each of its claims is presumed valid, 35 U.S.C. § 282; *Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1266–67 (Fed.Cir.1991), the heavy burden of showing the invalidity of a patent rests upon the party asserting invalidity, *Nutrition 21,* 930 F.2d at 869; *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 446 (Fed.Cir.), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); and the party asserting invalidity must overcome the statutory presumption by clear and convincing evidence based on undisputed facts. *Quad Envtl. Technologies Corp. v. Union Sanitary Dist.,* 946 F.2d 870, 872 (Fed.Cir.1991). However, the presumption of validity is not evidence that can be weighed in determining the likelihood of success factor. *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882 (Fed. Cir.1992). Moreover,

the presumption does not relieve a patentee who moves for a preliminary injunction from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity. . . . At this preliminary stage, the trial court does not resolve the validity question but rather must ... make an assessment of the persuasiveness of the challenger's evidence, recognizing that it is doing so without all evidence that may come out at trial.

The district court cannot be held to have erred in deciding that the patentee failed to make a sufficient showing of likelihood of success required to support a preliminary injunction where the evidence presented in support of invalidity raises a substantial question, although the defense may not be entirely fleshed out. Given the time constraints within which an accused infringer must usually respond with evidence to a motion for preliminary injunction ..., a fully comprehensive presentation cannot reasonably be required.

*Id.* at 882–83 (footnotes and citations omitted). With that standard at hand, the court will consider DIP's challenge to the validity of the '328 patent under both 35 U.S.C. § 102(b) and § 103.

### (1) 35 U.S.C. § 102(b)

DIP contends that the '328 patent is invalid under § 102(b) because APS began selling the expander ring described in the '328 patent more than one year prior to the November 12, 1993, filing date of the application[14] for the '328 patent ("'566 application"). 35 U.S.C. § 102(b) bars entitlement to a patent when:

(b) the invention was ... described in a printed publication in this country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States ...

APS does not dispute that it began selling the expander ring more than one year prior to filing the '566 application. APS, however, contends that it is entitled to the March 17, 1989, filing date of the parent application ("'157 application") for the '328 patent.[15] Patent law provides that when certain conditions are met, a provisional application is entitled to the earlier filing date of a related application. 35 U.S.C. § 120.[16] A required condition for this benefit is that the invention be "disclosed in the manner provided by the first paragraph of section 112 .. an application previously filed ..."[17]

DIP contends that APS cannot rely on the '157 application because it did not contain a sufficient description of the expansion ring to comply with the specificity requirements of § 112. In support of its argument, DIP proffers only the affidavit of its patent expert, Eugene Rentz. Rentz contends that the patent examiner rejected the description of the concept of the expander ring in the '157 application because it did not comply with the specificity requirements of § 112 and that the applicant for the expander ring patent did not overcome that objection before the filing of the '566 application and, in any event, the patent applicant had abandoned the '157 application prior to filing the '566 application. *Id.* at ¶¶ 8–16. Rentz, however, attaches no documentary evidence supporting his assertion to his affidavit.

APS agrees that throughout the prosecution of the '157 application, the patent examiner repeatedly rejected the description of the expander ring for failing to meet the requirements of § 112 and that the '157 patent was abandoned on September 18, 1991. Moore Aff., ¶¶ 11–12. APS, however, contends that the patent applicant successfully revived the '157 application prior to the filing of the '566 application, that the transmittal

14. Application Serial No. 07/790,566.

15. APS alleges that the '566 application is a continuation of Application Serial No. 325,157.

16. 35 U.S.C. § 120 provides:
An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

17. The first paragraph of 35 U.S.C. § 112 provides that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

letter accompanying the '566 application specifically stated that '566 application was a continuation application of the '157 application, that the § 112 issue raised during the prosecution of the '157 application was still before the patent examiner during the prosecution of the '566 application and that the patent examiner subsequently determined that the description of the expander ring complied with § 112. *Id.* at ¶¶ 12–18. APS thus argues that its is entitled to the benefit of the filing of the '157 patent and, therefore, that the bar contained in § 102(c) is not applicable in this case. In support of its argument, APS offers little factual or legal analysis beyond the affidavit of its expert, Malcolm Moore.

Upon examination of the parties' submissions regarding their positions concerning the propriety of APS's reliance on the '157 application, the court finds that it is unable to determine which party is likely to succeed on its argument. DIP proffers evidence and legal analysis, albeit a small amount, that the '328 patent is invalid under § 102(c). In response, APS proffers a small amount of evidence and legal analysis suggesting that DIP's argument is erroneous. Overall, however, both parties' submissions concerning the § 102(c) issue provide the court with little factual or legal assistance in resolving the dispute. Beyond the conflicting expert affidavits, the record contains few documents from the prosecution of the '157 and '566 applications and almost no legal analysis. Thus, because it is unable to arrive at any concrete conclusions regarding the § 102(c) issue, the court concludes this particular issue does not weigh in favor of granting or denying APS's motion for a preliminary injunction.

#### (2) 35 U.S.C. § 103

DIP contends that the '328 patent is invalid under § 103 because the concept of an expander ring would be obvious to a person examining the pertinent prior art. 35 U.S.C. § 103 provides, in part, that:

A patent may not be obtained though the invention is not identically disclosed or described as forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Whether a patent is obvious under § 103 is a question of law that is based on factual findings. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

The court must consider the following factors in making its factual findings regarding obviousness:

(1) the scope and content of the prior art;

(2) the differences between the prior art and the claimed invention;

(3) the level of ordinary skill in the art to which the invention pertains; and

(4) objective evidence that serves as indica of non-obviousness, commonly referred to as "secondary considerations."

*Graham,* 383 U.S. at 17–18, 86 S.Ct. at 693–694. Such secondary considerations include evidence of (a) the invention's satisfaction of previously recognized and unsolved needs; (b) acceptance and copying of the invention by those concerned with the subject matter; (c) the commercial success of the invention; and (d) the failure of others to create the claimed invention. *Id.; Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1380 (Fed.Cir.), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). The court must consider those secondary considerations of obviousness before it can reach a conclusion of law. *Hybritech,* 802 F.2d at 1380. Those factors can be the most probative evidence of nonobviousness in the record. *Custom Accessories, Inc. v. Jeffrey–Allan Indust., Inc.,* 807 F.2d 955, 960 (Fed. Cir.1986). However, the absence of such considerations "does not preclude a finding of nonobviousness because such evidence is not a requirement for patentability." *Id.* Once the court sets forth the factual findings required under *Graham,* the *Graham* inquiry requires the court to ascertain whether those facts establish by clear and convincing evidence that the claimed invention as a whole would have been obvious to a person of ordinary skill in the art to which the invention pertains at the time the invention was made. *See e.g., Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1568 (Fed.Cir.), *cert. denied,*

481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

In support of its argument under § 103, DIP proffers only Renz's opinion that six prior art references, four of which the patent examiner considered during the prosecution of the '566 application, render the '328 patent obvious.[18] However, other than citing *Graham*, DIP does not provide the court with substantiation for the analysis, outlined above, that the court must perform. Nevertheless, even a cursory analysis of the six prior references, even giving deference to the patent examiner's review of four of those references, preliminarily reveals that the concept of expanding a cooking chamber with an expander ring would be obvious to one skilled in the art. For example, U.S. Patent No. 2,472,620 describes a pressure cooker consisting of:

> a portion . . ., an intermediate section . . ., and a top portion or cover . . ., but it is to be understood that more intermediate sections may be added if preferred, or the intermediate section . . . may be entirely omitted where a cooker of smaller capacity is required. The base section and the intermediate section are, along the top edges thereof, made with segmental flanges . . . of a size to fit within channeled segmental flanges at the bottom edges of the intermediate section . . . and the cover. . . . All of these flanges should be exactly alike in order that all parts of the cooker may be interchangeable and so as to make it possible to increase or decrease the number of intermediate sections or entirely to leave out such sections, all as above referred to.

U.S. Patent No. 2,472,620, Col. 1, lines 31–48.

In opposition to DIP's argument, APS contends that four of the prior art references were considered by the patent examiner during the prosecution of the '328 patent and a

finding that at least one those references rendered the '328 patent obvious would merely substitute Renz's opinion for the patent examiner's opinion. *See e.g., Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985) (patent examiner's decision is not binding on the court, but is evidence that court must consider in determining whether the party asserting invalidity has met its burden). In addition, in a cursory analysis of its own, APS argues that Renz's reasoning is fundamentally flawed. APS, however, performs almost no analysis under *Graham* and analyzes little of the prior art upon which DIP relies.

Because the parties' submissions regarding their positions concerning the obviousness issue are limited, the court finds that it is unable to determine which party is likely to succeed on their argument. DIP proffers some evidence and legal analysis that the '328 patent is obvious and, therefore, invalid under § 103. In response, APS proffers some evidence and legal analysis that DIP's argument is erroneous. Overall, however, both parties' submissions concerning the obviousness issue provide the court with little assistance in resolving the dispute. Thus, because it is unable to arrive at any concrete conclusions regarding the obviousness issue, the court concludes this particular issue does not weigh in favor of granting or denying APS's motion for a preliminary injunction.

Based on the foregoing, the court concludes that the first *Dataphase* factor, the likelihood of success on the merits, does not weigh in favor of granting or denying APS's motion for a preliminary injunction on its patent claim.

## 2. Irreparable Harm to APS

██ Generally, irreparable harm is presumed for purposes of a preliminary injunc-

---

18. DIP proffers the following prior art references:
 1. Double Baking–Pan, U.S. Patent No. 304,-111, issued August 26, 1884;
 2. Pressure Cooker, U.S. Patent No. 2,472,-620, issued June 7, 1949;
 3. Hot Air Grill, U.S. Patent No. 4,295,034, issued October 13, 1981;
 4. Multipurpose Electrical Kitchen Heating Device with Top and Bottom Heating, Swiss Patent No. 643,129;

 5. Portable Roaster and Broiler, U.S. Patent No. 2,523,796, issued September 26, 1950; and
 6. Two–Zone Hot Air Oven for Food–Loaded Cartridges, U.S. Patent No. 4,132,216, issued January 2, 1979.
 The patent examiner consider the latter four patents in prosecuting the '566 application. *See* Vandenburgh Aff., Exh. 5 ('328 patent).

tion motion on a patent infringement claim once the moving party establishes a likelihood that it will demonstrate that its patent is valid and infringed. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987) (citation omitted); *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1580–81 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). Because the court has concluded that APS has not established that it is likely to succeed on the merits of its patent infringement claim, APS does not enjoy that presumption. *Nutrition 21*, 930 F.2d at 871. Nevertheless, APS contends that it is essential that it be allowed the benefits of the exclusive rights granted by the patent laws. APS argues that consumer choice with respect to the hot air ovens is based, in great part, on the expander ring accessory. APS reasons that without the enforcement of its rights under the patent laws, it will likely lose sales and that lost sale will threaten its economic stability. Moreover, APS reasons that it will lose both retailer and consumer goodwill, injuries that are difficult to quantify. APS thus argues that it will be irreparably harmed if the court denies its motion for an injunction on its patent claim.

The court determines that APS's fear of economic harm should the court deny its motion does not constitute irreparable harm for purposes of an injunction motion.

> [N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial.

*Id.* at 871 (citation omitted). Acceptance of APS's position "would require a finding of irreparable harm to every manufacturer/patentee, regardless of circumstances." *Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 683 (Fed.Cir.1990); *see also Nutrition 21*, 930 F.2d at 871 .("[T]he district court's reliance on possible market share loss would apply in every patent case where the patentee practices the invention."). Moreover, APS is not likely to suffer irreparable harm because DIP is a financially responsible company that could satisfy any money damages that APS might be awarded. *Nutrition 21*, 930 F.2d at 871 (no finding of irreparable harm because alleged infringer is a financially responsible company answerable in damages). Accordingly, the court concludes that the second *Dataphase* factor, the irreparable harm to APS should the court deny its motion, weighs in favor of denying APS's motion for a preliminary injunction on its patent claim.

### 3. Balance of Harms

Injunctive relief is not appropriate if the hardship to DIP, should the preliminary injunction be issued, outweighs the hardship to APS, should the preliminary injunction be denied. The court finds that APS will not be substantially harmed if the court denies its motion for a preliminary injunction. The possibility that APS might lose some profits and goodwill if the court permits DIP to continue to sell its expansion ring is not the type of harm that warrants the issuance of a preliminary injunction, especially in light of the fact that the court has concluded that APS has not demonstrated that its patent is valid and infringed. Moreover, the court notes that DIP would likely suffer some harm if the court were to issue a preliminary injunction. An injunction on the patent claim might severely hamper DIP's ability to compete with APS during the pendency of this litigation. An inability to compete might irreparably harm DIP's economic viability. Balancing the potential harms to the parties, the court finds that the potential harm to DIP should the court issue an injunction would be a greater burden that the potential harm to APS should the court deny its request for an injunction. The court thus concludes that the third *Dataphase* factor, the balance of harms, weighs in favor of denying APS's motion for an injunction on its patent claim.

### 4. The Public Interest

Generally, the public interest favors the protection of patent rights. *Illinois Tool Works,* 906 F.2d at 684; *Hybritech,* 849 F.2d at 1458. However, because APS has not made a showing that it is likely to prove that the '328 patent is valid and infringed, APS does not benefit from that general rule. Thus, balanced against APS's right to protection of its patent is DIP's right to compete

and the public's interest in fostering competition. *See e.g., Illinois Tool Works,* 906 F.2d at 684 (approving district court's weighing of public's interest in the protection of patent rights against the alleged infringer's right to compete "in view of ... [the alleged infringer's] 'remote' showing of likelihood of success in proving infringement at trial."). The court finds that at this stage of the litigation, the balance weighs slightly in favor of DIP's right to compete. *See e.g., Illinois Tool Works, Inc. v. Grip–Pak, Inc.,* 725 F.Supp. 951, 959 (N.D.Ill.1989) ("In all likelihood, ... [the alleged infringer] is competing legitimately with ... [the patentee] in the beverage carrier market. To inhibit such competition upon a remote showing of infringement is not in the public interest, as it will be the public who will pay for such unnecessary protection."). The court thus concludes that the fourth *Dataphase* factor, the public interest, weighs in favor of denying APS's motion for an injunction on its patent claim.

Based on the foregoing, the court concludes that APS has not made a sufficient showing under *Dataphase* to justify the entry of a preliminary injunction on its patent infringement claim.

Accordingly, **IT IS HEREBY ORDERED** that APS's motion for a preliminary injunction on its false advertising and patent infringement claims is denied.