**ABBOTT LABORATORIES, Plaintiff,**

v.

**SELFCARE, INC. and Princeton Biomeditech Corporation, Defendants.**

**Civil Action No. 98–10674–GAO.**

United States District Court, D. Massachusetts.

Aug. 5, 1998.

Lee C. Bromberg, Bromberg & Sunstein, Boston, MA, Peter B. Ellis, Foley, Hoag & Eliot, Boston, MA, Mary Kay McCalla Martire, Claudette P. Miller, Hopkins & Sutter, Chicago, IL, Jose E. Rivera, Jr., Regina M. Anderson, Office of General Counsel, Abbott Park, IL, for Plaintiff.

John E. Kidd, Thomas F. Fleming, Rogers & Wells, New York City, Peter B. Ellis, Foley, Hoag & Eliot, Boston, MA, Michael A. O'Shea, Rogers & Wells, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff Abbott Laboratories ("Abbott") and the defendants Selfcare, Inc. ("Selfcare") and Princeton BioMeditech Corporation ("PBM") each manufacture and sell pregnancy test kits for home use that employ immunoassay techniques. In this action, Abbott claims that the defendants are selling kits that infringe two patents of which Abbott is the licensee, U.S. Patent No. 5,073,484 (the " '484 Patent") and U.S. Patent No. 5,654,162 (the " '162 Patent"). Abbott has moved for a preliminary injunction to enjoin the defendants from the manufacture, use, offer for sale, or sale of products that infringe the '162 Patent. The matter was presented to the Court on a record that included the pleadings, affidavits and memoranda of law, and the parties were heard in oral argument. For the reasons that follow, the Court determines that the plaintiff has not adequately satisfied the prerequisites for a preliminary injunction, and the motion is accordingly denied.

### FACTUAL BACKGROUND

A test for pregnancy can be done by determining whether a particular hormone known as human chorionic gonadotropin ("hCG") is present in a woman's urine. The self-test products sold by the parties involve a simple procedure whereby a sample of urine is deposited at a designated place on a device and shortly afterwards a positive or negative test result is indicated by the appearance, or non-appearance, of a color change at another designated place on the device.

Abbott's FactPlus Pregnancy Test ("FactPlus") employs a technique described as a "sandwich assay." In a sandwich assay, a molecule of the substance sought to be detected (the "analyte") is "sandwiched" between, on the one hand, a molecule of another substance that is a specific antibody for the analyte (and therefore is attracted to and binds with it) which has been "labeled," as with an enzyme that produces a characteristic color change, and on the other hand, another molecule of antibody that is fixed, or "bound," to a substrate. When a sandwich is completed, the analyte is, in effect, bound between the two antibodies, as if in a sandwich. An accumulation of analyte-labeled antibody pairs permits the labeling, such as color change, to be visible to the observer.

In the FactPlus test, urine is applied to the designated site and travels through a permeable membrane by capillary action. As it does so, any hCG in the sample binds with a color-labeled hCG antibody present in the membrane to form a "conjugate pair." The labeled pair continues to travel by capillary action to a "reaction zone," where hCG antibodies affixed to the zone bind with the hCG molecule in the conjugate pair that is flowing by, completing the "sandwich" and capturing the pair. An aggregation of the labeled conjugates yields a visible color change in a distinctive pattern. There is also a "control" signal to indicate that the test has worked properly. In FactPlus, the control is a single horizontal line—a minus sign—and the positive reading is a vertical line that traverses the horizontal control—creating a plus sign.

For purposes of the motion for a preliminary injunction, Abbott focuses on its claim that the defendants are infringing independent Claim 22 of the '162 Patent, which describes an invention as follows:

A device for detecting the presence of an analyte in a carrier liquid suspected of containing said analyte, which device comprises a liquid permeable solid medium which defines a path for fluid flow capable of supporting capillary flow, along which are

i) a site for application of the carrier liquid,

ii) a diffusively bound labeled antibody specific for the analyte or a chemical moiety which is itself the reaction product of the analyte with another chemical moiety, said antibody being capable of flow along the flow path, and

iii) one or more zones spaced along said flow path, each zone having a predetermined amount of a reactant bound to it which is specific for either the analyte or a chemical moiety which is itself the reaction product of the analyte with another chemical moiety;

wherein said device can be used by contacting a carrier liquid with said application site in such a manner that permits said liquid to pass along the flow path by capillary flow such that analyte or reaction product of the analyte with another chemical moiety becomes bound to both the labeled antibody and the reactant bound to the solid medium; and

wherein the labeled antibody, with the reactant bound to the solid medium, sandwiches the analyte or a chemical moiety which is itself the reaction product of the analyte with another chemical moiety.

Pl.'s App. Supp. Prelim. Inj., Ex. D, col. 17, l. 16–col. 18, l. 8.

Abbott alleges that the defendants' home pregnancy tests employ a sandwich assay process in which "diffusively bound labeled antibodies" bind to hCG molecules to form a conjugate pair that binds to a predetermined amount of hCG antibodies in a reaction zone, yielding the test result. According to the plaintiff, these devices read on Claim 22 and infringe.

### LEGAL ANALYSIS

■ Whether a preliminary injunction should issue turns upon four factors: "(1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in its favor; and (4) the adverse impact on the public interest." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir. 1994). *See also Bio–Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1558 (Fed. Cir.1996). The first factor is critical. "[T]he patentee carries the burden of showing likelihood of success on the merits with respect to the patient's validity, enforceability, and infringement." *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed.Cir.1991). If a patentee makes a "clear showing" that a valid patent is being infringed, there arises a presumption that the patentee will suffer irreparable harm in the absence of injunctive relief. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed.Cir.1985). In evaluating whether to grant a preliminary injunction, a court must weigh each factor and consider the form and severity of the relief requested. *Alliance Research Corp. v. Telular Corp.*, 859 F.Supp. 400, 402 (C.D.Cal. 1994).

### A. Reasonable Likelihood of Success on the Merits.

Selfcare and PBM defend their products on two grounds, arguing first that their products do not infringe the '162 Patent and second that Claim 22 is invalid under 35 U.S.C. §§ 102, 103, and/or 112.

#### i. Infringement.

■ Infringement analysis is a two-step process. The Court must determine the scope of the claim and then assess whether all of the elements or limitations of the claim are present in the accused devices. *Vehicular Technologies, Corp. v. Titan Wheel Int'l.*, 141 F.3d 1084, 1088 (Fed.Cir.1998). Claim construction is a legal question to be decided by the Court. *Cybor Corp. v. FAS Technologies*, 138 F.3d 1448, 1455 (Fed.Cir.1998) (en banc). Claim terms are given their ordinary meaning to one of ordinary skill in the art unless a special meaning appears in the patent. *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995). Plain words of the claims anchor the meaning of the claims, *see Vivid Technologies, Inc. v. American Science & Eng'g, Inc.*, 997 F.Supp. 93, 97 (D.Mass. 1997), though the Court may look to the specification, prosecution history, and other relevant evidence to give the necessary context to the claim language. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1551 (Fed.Cir.1997). When the meaning of a term is sufficiently clear in the patent specification, that meaning shall apply. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir. 1998).

It is premature on the present record and for the present purpose to attempt a definitive construction of Claim 22. It appears, however, that the claim includes the following elements: (1) a "liquid permeable solid medium which defines a path for fluid flow capable of supporting capillary flow," (2) along which are (3) an application site, (4) a

"diffusively bound labeled antibody specific for the analyte ... capable of flow along the flow path," and (5) "one or more zones ..., each zone having a predetermined amount of a reactant bound to it" which is also specific for the analyte, (6) wherein a carrier liquid applied to the application site flows by capillary action along the flow path "such that ... the analyte ... becomes bound to the solid medium," and (7) the labeled antibody sandwiches the analyte with the bound reactant.

The declaration of Dr. Jou, on behalf of the plaintiff, demonstrates that the defendants' products appear to function according to these elements. According to Jou, the products manufactured by Selfcare and PBM have a site for application of the carrier liquid (urine), from which point the urine moves by capillary flow through a strip which is a liquid permeable solid membrane until it meets a pad containing a diffusively bound labeled antibody specific for hCG, which diffuses into the urine. Any hCG in the urine then binds to the labeled antibody and together the analyte/antibody pair moves by capillary flow to a test zone where another reactant specific for hCG is fixed (or "bound") to the membrane. Each analyte/antibody pair then creates a sandwich with the reactant bound to the test zone, and the accumulation of labeled pairs create a color indicating the presence of the analyte. Pl.'s App. Supp. Prelim. Inj., Ex. A, Jou Decl. ¶¶ 24–28, 33–51. This description encompasses the seven steps outlined in the preceding paragraph. Accordingly, on the present record, the plaintiff has made a showing that it has a reasonable likelihood of proving literal infringement at trial.[1]

The defendants raise several arguments against infringement. They contend that Claim 22 discloses a device for conducting a quantitative test to measure the amount of analyte present in a host liquid, rather than a qualitative test that simply detects the presence of the analyte. They also say that the labeled antibodies in their devices are found in a separate "conjugate pad," rather than "along" the liquid permeable solid membrane. Further, they argue that their products employ neither a "diffusively bound labeled antibody" as that term is used in the claim nor a "predetermined amount" of bound reactant.

It is true that the specification in the '162 Patent contains references to, and examples of, quantitative assessment of an analyte, but the device and method disclosed in Claim 22 is not necessarily limited to that. The language of the claim itself says it describes a "device for detecting the *presence* of an analyte." Pl.'s App. Supp. Prelim. Inj., Ex. D, col. 17, l. 16 (emphasis added). Some embodiments of the invention might include, in addition, a scale for quantifying the amount of analyte present, but that does not mean that an embodiment that only detects presence, and not quantity, is not within the scope of the claim.

Similarly, it is fair to infer that in manufacturing their devices, the defendants use a "predetermined amount" of bound reactant. It would be highly improbable that the amount of reactant applied to each device would not be standardized in the manufacturing process. At the very least, it would be necessary to assure that enough antibody was bound to the reaction zone to yield a visible reading. There would have to be at least a "predetermined" minimum that would be satisfactory for the operation of the device.

The defendants point out that the patent does not specifically define what it means by a "diffusively bound labeled antibody." They then argue that they cannot be held to be infringing an undefined term.[2] Of course,

---

1. The defendants correctly point out that Abbott has not made a case for infringement under the doctrine of equivalents.

2. If a "diffusively bound labeled antibody" is what is described in Example IV in the specification, which the defendants say the plaintiff has suggested, then there is no infringement because it is clear that the accused devices are dissimilar to what is described in Example IV. It appears,

however, that the defendants are mischaracterizing the plaintiff's reference to Example IV. The reference was made to demonstrate support for the claim respecting the "use of a single solution (as opposed to the need for an eluant and/or wash solution)." *See* Defs.' Oppos. to Prelim. Inj., Ex. 10, Amendment, August 6, 1996, sub par. (2), first occasion, at 7. Moreover, the reference there is to a "diffusible antibody," not a "diffusively bound" antibody.

the term does not lack meaning because it is not defined. Giving meaning to undefined terms is a task of claim construction. Abbott argues that the term is self-defining and has a plain meaning, but that proposition is undercut by the oxymoronic tension that seems to exist between the words "diffusively" and "bound." Nevertheless, the definition offered in the plaintiff's brief is a plausible one, as the defendants' expert, Dr. Ertingshausen, seems to recognize, if not acknowledge. Under that definition, a "diffusively bound labeled antibody" is a "labeled antibod[y] bound to the membrane, which diffuse[s] into the liquid and flow[s] along the path, binding to analyte molecules contained in the liquid." Defs.' App. Oppos. Prelim. Inj., Ex. 1, Ertingshausen Decl., ¶ 25. Dr. Jou's experiments indicate that the defendants' devices meet that definition.[3]

Finally, the plaintiff has a good likelihood of establishing that the labeled antibodies in the accused devices are "along" the "liquid permeable solid medium." Strictly speaking they are found on a "filter pad" that the fluid encounters as it moves by capillary flow through the "medium" and not directly on the "medium" itself. *Id.*, ¶ 28. However, it seems reasonable to construe the description "along" in this context to include not only a site that is an integral part of the structure of the "medium" proper but also a site that is immediately adjacent to it—or "alongside" it.

### ii. *Validity.*

The defendants raise two defenses concerning the validity of the '162 Patent. Though a patent is presumed to be valid, *see* 35 U.S.C. § 282,

> the presumption does not relieve a patentee who moves for a preliminary injunction from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity. At this preliminary stage, the trial court does not resolve the validity question but rather must ... make an assessment of the persuasiveness of the challenger's evi-

dence, recognizing that it is doing so without all evidence that may come out at trial.... *While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit.*

*New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882–83 (Fed.Cir.1992) (emphasis added) (citations omitted).

The defendants first argue that the '162 Patent is invalid on the ground that it is both anticipated and obvious in light of the prior art. 35 U.S.C. §§ 102, 103. They point out that U.S. Patent No. 4,425,438, issued to Bauman, et al. ("Bauman"), discloses a device for quantitatively measuring an analyte, and that U.S. Patent No. 4,446,232, issued to Liotta ("Liotta"), discloses a diffusively bound labeled antibody for determining the presence of an analyte. They maintain that these two patents together disclose all elements of Claim 22, thus both anticipating that claim and rendering it obvious. *See* Defs' App. Oppos. Prelim. Inj., Ex. 1, Ertingshausen Decl., ¶ 58.

It is Abbott's position that "no prior art device teaches a one-step, sandwich assay test with highly reliable results that can be performed outside the laboratory with an initially dry, self-contained kit and where the only ingredient added by the user is the liquid sample itself." Abbott's Mem. Supp. Prelim. Inj. at 14. It is not necessary, however, that all the elements of the patented device have been previously embodied in a single antecedent device. Nonetheless,

> [w]hen it is necessary to select elements of various teachings in order to form the claimed invention, we ascertain whether there is any suggestion or motivation in the prior art to make the selection made by the applicant.... Obviousness can not be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching suggestion or incentive supporting the combination.

*In re Gorman*, 933 F.2d 982, 986 (Fed.Cir. 1991) (internal quotations and citations omitted).

---

**3.** It is a separate question whether, because it is not defined by words or illustration, the term "diffusively bound labeled antibody" is sufficient-

ly informative to enable a reader of the patent to practice the invention claimed. *See* discussion *infra* pp. 10–12.

Here, the Liotta patent recognizes that the invention there claimed may be used as "a home pregnancy test." Defs.' App. Oppos. Prelim. Inj., Ex. 18, col. 2, ll. 4–5. Likewise, Bauman recognizes that his invention may be used to assay hormones. *Id.* Ex. 16, col. 5, ll. 39–48. Thus, the defendants say, these patents themselves suggest a combination of the art disclosed in a single device, such as each of the ones made by both the plaintiff and the defendants. The matter should not be firmly decided at this point. On the present limited record, it at least cannot be said that the defendants' proposition "lacks substantial merit." *New England Braiding,* 970 F.2d at 883.

The defendants also contend that Claim 22 is invalid under 35 U.S.C. § 112, because neither the patent specification nor any of the examples in it teach how to practice the invention as Abbott now seeks to characterize it. Echoing Abbott's assertion that the prior art does not teach a one-step sandwich assay, the defendants say that neither does Claim 22, read in conjunction with the specification. Importantly, nothing in the specification or in any of the examples discloses what the language of Claim 22 calls "a diffusively bound labeled antibody." Example IV, the example of a sandwich assay in the specification, describes a labeled antibody which is added to a solid medium *after* the test sample has been added and which is not bound to the solid medium in the way that it is in the Fact Plus kit. It thus appears that Example IV rather teaches a *two-step* sandwich assay. Moreover, nothing else in the patent describes a sandwich assay, and nothing else teaches how an antibody can be, or become, "diffusively bound." [4]

▮▮▮ "[T]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.' " *In re Wright,* 999 F.2d 1557, 1561 (Fed.Cir.1993)(quoting *In re Vaeck,* 947 F.2d 488, 495 (Fed.Cir.1991)). "That some experimentation may be required is not fatal;

the issue is whether the amount of experimentation required is 'undue.' " *In re Vaeck,* 947 F.2d at 495 (internal quotations and citation omitted). This is a question of law. *Id.* "While every aspect of a generic claim certainly need not have been carried out by an inventor, or exemplified in the specification, reasonable detail must be provided in order to enable members of the public to understand and carry out the invention." *Genentech, Inc. v. Novo Nordisk,* 108 F.3d 1361, 1366 (Fed.Cir.1997).

The defendants present a plausible case that Claim 22, read in the context of the specification, fails to teach in reasonable detail how one of ordinary skill in the art of immunoassay technology would practice the "diffusively bound labeled antibody" element claimed in Claim 22. To be sure,

> a specification need not disclose what is well known in the art.... [T]he omission of minor details does not cause a specification to fail to meet the enablement requirement. However, when there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out, undue experimentation is required; ... It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement.

*Id.* (citation omitted). However, there is nothing in the present record to support a conclusion that the method would be known to a person of ordinary skill in the art. Under these circumstances, it cannot be said at this point that the defendants' theory of invalidity "lacks substantial merit." *New England Braiding,* 970 F.2d at 883.

Because the defendants have raised questions concerning the validity of the patent claim at issue, and because the plaintiff has not shown that these defenses lack substantial merit, a preliminary injunction should not issue. *Genentech,* 108 F.3d at 1364.

In any event, there is no similar claim depending from Claim 22, and it is only Claim 22 that is in issue at this stage.

---

4. Claim 10, dependent from Claim 9, suggests a one-step assay but fails to describe how the labeled antibody can be "diffusively bound" to the membrane to accomplish the one-step process.

*B. Irreparable Harm.*

When the patentee makes a strong showing of both validity and infringement, the Federal Circuit has held that irreparable harm can be presumed. *Smith Int'l. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed. Cir.1983). However, because Abbott has not made that showing, at least with respect to the issue of validity, it is not here entitled to the presumption of irreparable harm. *See Eli Lilly and Co. v. American Cyanamid Co.,* 82 F.3d 1568, 1578 (Fed.Cir.1996); *see also High Tech Medical Instrumentation v. New Image Indus.,* 49 F.3d 1551, 1556 (Fed. Cir.1995). The lack of a presumption does not mean, however, that Abbott may not demonstrate by evidence that it will suffer irreparable harm.

The evidence is not compelling. Abbott urges that, as a result of the defendants' infringement, it is losing market share, distribution channels, consumer good will, brand equity, and the ability to set a fair price for its patented products. These arguments are supported by the declaration of Peter C. Gonze, Divisional Vice President of Sales and Marketing for Abbott's subsidiary, Medi-Sense Inc., which makes the FactPlus product. Gonze's declaration is, however, somewhat general and conclusory. It is countered by the declaration of David E. Bell, a professor of business administration, offered by the defendants. Again, no firm judgments can be made on the present record, but there seems good reason to doubt that the effects of the defendants' continued competition are as severe as the plaintiff predicts. The impact Abbott may be experiencing seems as likely to be from "private label" tests in general, rather than the defendants' products in particular, and it seems also likely that any void created by an injunction against the defendants' products would be filled not by branded products, like Abbott's, but by other private label sources.

■ Another factor pointing away from the likelihood of irreparable harm in this case is Abbott's delay of nine months between the time it became the licensee under the '162 Patent and the time it sought to enforce it by injunctive relief. *See Genderm Corp. v. Ferndale Laboratories, Inc.,* 32 U.S.P.Q.2d 1567, 1575, 1994 WL 706591 (E.D.Mich.1994). "Delay in seeking preliminary injunctive relief is a factor tending to show the absence of irreparable injury because it is an act 'incompatible with the emphasis on the [patentee's] right to exclude that is the basis for the presumption.'" *Id.* at 1575 (quoting *T.J. Smith and Nephew Ltd. v. Consolidated Medical Equip., Inc.,* 821 F.2d 646, 648 (Fed.Cir.1987)). The fact that a patentee delayed for a substantial period of time before seeking an injunction *pendente lite* at least suggests that the status quo does not irreparably damage it. *Id.*

The plaintiff argues that the nine-month delay resulted from a need to study carefully the '162 patent claims, to assess whether the Selfcare and PBM devices were infringing, and to review the market impact of those devices on the sales of the FactPlus pregnancy tests. That may be so, although this is not a case where the allegedly infringing products have suddenly appeared in the market without warning. The defendants' products have been competing in the market for home pregnancy tests for a number of years, and Abbott was surely aware of these products—and at least generally how they worked—when it acquired the license under the '162 Patent. Be that as it may, if it took nine months for Abbott to examine the accused devices and assess the intricacies of the home pregnancy test market, it would seem manifestly unfair to be quick to enter a preliminary injunction against the defendants after they had less than two months' notice that their products are accused. In that short time, they have raised enough doubt about the plaintiff's ultimate success to warrant a denial of preliminary relief.

*C. Balance of the Hardships.*

■ "[A] trial court need not make findings concerning the third and fourth factors [of the preliminary injunction analysis] if the moving party fails to establish either of the first two factors." *Polymer Technologies v. Bridwell,* 103 F.3d 970, 973–74 (Fed.Cir. 1996). Nevertheless, it may be noted that in this case both the plaintiff and the defendants make persuasive arguments about the harms they would suffer if the Court were to

decide against them. But because the plaintiff has failed to make the showing required on the first two prongs, fairness compels a finding that the equities tip in favor of the defendants in this case. A preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Technology, Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993). "The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating." *Illinois Tool Works, Inc. v. Grip–Pak, Inc.,* 906 F.2d 679, 683 (Fed.Cir.1990).

*D. Public Interest.*

The public has an interest both in protecting patent rights and in ensuring that markets are competitive. *Id.* at 684. It would be as adverse to the public interest for this Court to enjoin a fair competitor as it would be for it to fail to enjoin the sale of an infringing product. This factor in the preliminary injunction analysis does not help the plaintiff when a likelihood of success on the merits has not been established.

### CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Preliminary Injunction is DENIED.

It is SO ORDERED.